IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No.   10-cr-507-REB
11-cr-237-REB

UNITED STATES OF AMERICA,

    Plaintiff,

v.

TIMOTHY WAYNE LEE,

    Defendant.

## MOTION FOR COMPASSIONATE RELEASE

Timothy Wayne Lee, by and through undersigned court-appointed counsel, Eric K. Klein of Johnson & Klein, PLLC, respectfully moves this Court pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) to grant him compassionate release and reduce Mr. Lee's sentence to time-served.  Mr. Lee's mother's failing health, the need to care for his minor son, and the COVID-19 pandemic justify the Court granting compassionate release in this case. Counsel further states as follows:

### I. Introduction

On July 12, 2011, Mr. Lee pleaded guilty in the above-captioned cases.  On December 2, 2011, the Court sentenced Mr. Lee to 180 months in prison, with incarceration for the two cases running concurrently.  Mr. Lee has served nine years of imprisonment, and with good-time credit, he has served the mandatory minimum for his

offenses of conviction. According to the Bureau of Prisons (BOP), Mr. Lee's current projected release date is June 13, 2023.

Mr. Lee now asks this Court to exercise its authority under the First Step Act to grant him compassionate release and reduce his sentence to time-served. Mr. Lee is less than two years from his release date, and he is badly needed at home to care for his minor son. Mr. Lee's mother is in ill health suffering from pancreatic cancer, diabetes, and high blood pressure, and she cannot care for Mr. Lee's son by herself. Mr. Lee is additionally confined in a prison in Arizona, a state itself suffering from a surge in coronavirus cases, and by simply being there, Mr. Lee is in danger of never being able to return to his mother and son.

As amended by the First Step Act, the compassionate release statute, 18 U.S.C. § 3582(c)(1)(A)(i), allows courts to reduce sentences for "extraordinary and compelling" reasons. Sentence reductions under § 3582(c)(1)(A)(i) must be consistent with the policy statement in U.S.S.G. § 1B1.13 and must reflect consideration of the sentencing factors in 18 U.S.C. § 3553(a). Under these considerations, Mr. Lee qualifies for relief. There are family circumstances that were not present when Mr. Lee was sentenced that have arisen in the wake of the global health crisis sweeping the nation. The unavailability of care for Mr. Lee's minor son meets the criteria for "extraordinary and compelling" reasons in U.S.S.G. § 1B1.13, Application Note 1(C). In addition, the COVID-19 crisis is an extraordinary reason that, in light of Mr. Lee's other circumstances, additionally creates a compelling reason for release.

This Court has recently recognized that "[o]ne of the purposes of the First Step Act was to 'increas[e] the use and transparency of compassionate release,' by expanding the universe of persons who could seek such relief." *United States v. Edington*, No. 19-CR-00174-REB-1, 2020 WL 2744140, at *1 (D. Colo. May 27, 2020) (internal citation omitted; citing First Step Act, Pub. L. No. 115-391, 132 Stat. 5194, 5239 (Dec. 21, 2018)); *see also* 164 Cong. Rec. S7314-02, 2018 WL 6350790 (Dec. 5, 2018) (statement by Senator Cardin, co-sponsor of the First Step Act, noting that the Act "expands compassionate release" and "expedites compassionate release applications").  Mr. Lee's situation—with less than two years to serve from a 15-year sentence—is exactly what Congress had in mind in encouraging the expanded use of this option for the Court.

## II. Mr. Lee's request is ripe because more than 30 days have passed since Mr. Lee requested the Bureau of Prisons seek compassionate release on his behalf.

This Court has jurisdiction to consider a compassionate release motion filed by a defendant upon the defendant's exhaustion of administrative remedies or 30 days after a request for relief is received by the warden.  18 U.S.C. § 3582(c)(1)(A)(i).  On May 13, 2020, Mr. Lee submitted his form BP-8 Attempt at Informal Resolution (Request for Administrative Remedy), and on May 26, 2020, BOP staff acknowledged that the facility warden had received Mr. Lee's request for compassionate release.  (Attached as Exhibit 1.)  Because 30 days have elapsed since the warden received Mr. Lee's request, this Court has jurisdiction to consider his request.

### III. Extraordinary and compelling reasons warrant a reduction in Mr. Lee's sentence.

#### A. Changed family circumstances during this pandemic present extraordinary and compelling reasons to reduce Mr. Lee's sentence.

Under U.S.S.G. § 1B1.13, Application Note 1(C), "extraordinary and compelling reasons" for compassionate release include the "need to care for minor children . . . ." *See also Edington*, 2020 WL 2744140, at *3 (recognizing "compelling family circumstances such as the death or incapacitation of the sole caregiver for the defendant's minor children"). Furthermore, under U.S.S.G. § 1B1.13, Application Note 1(D), the Court may find extraordinary and compelling reasons outside of the categories defined in Application Notes (A)-(C). *See, e.g., Edington*, 2020 WL 2744140, at *2 (recognizing "that the most natural reading of the amended [18 U.S.C.] § 3582(c) and [28 U.S.C.] § 994(t) is that the district court assumes the same discretion as the BOP director when it considers a compassionate release motion properly before it"); *United States v. Redd*, No. 1:97-CR-00006-AJT, 2020 WL 1248493, at *8 (E.D. Va. Mar. 16, 2020) ("[T]he Court joins other courts in concluding that a court may find, independent of any motion, determination or recommendation by the BOP Director, that extraordinary and compelling reasons exist based on facts and circumstances other than those set forth in U.S.S.G. § 1B1.13 cmt. n.1(A)-(C) . . . ." (footnote omitted, citing cases)).

Here, Mr. Lee is needed at home to care for his fifteen-year-old son, H.T.L.[1] As documented in the Presentence Report, prior to Mr. Lee's incarceration, his mother, with whom Mr. Lee lived, had full custody of H.T.L. [#17 at ¶ 80.[2]] In 2010, H.T.L.'s mother brought him to California for what was supposed to be a one-week visit but then left him there and never returned. [*Id.*] In 2011, Mr. Lee's mother, Faye Lee, gained full custody of H.T.L. [*Id.*] However, as described to the Court by Mr. Lee and verified by undersigned counsel, during Mr. Lee's incarceration, H.T.L.'s mother regained custody. [#54 at 1.]

Recently, however, H.T.L.'s mother has been unable to care for him due to her addiction, and Child Protective Services has removed H.T.L. from her custody and returned him to Mrs. Lee. Mrs. Lee, however, is elderly and ill and unable to adequately care for H.T.L. herself. Mrs. Lee is 79 years old. As she describes in her letter to the Court, she was diagnosed with pancreatic cancer nine years ago. [Attached as Exhibit 2 hereto.] Mrs. Lee has described to counsel that when first diagnosed, it was believed that she would live for only eight months. Her cancer has gone into and come out of remission three times. [*See id.*; *see also* Letter from Tommie L. Williams, attached as Exhibit 3.]

Most recently, Mrs. Lee has gone through two rounds of chemotherapy. This significantly weakens her immune system. Under normal circumstances, this would

---

[1] Because Mr. Lee's son is a minor, he is referred to by his initials herein. Mr. Lee's son is identified in the Presentence Report at ¶ 80.
[2] For ease of reference, unless otherwise noted, all citations to docket entries are to Case No. 10-cr-00507-REB.

5

limit her ability to conduct her life as normal and have contact with the outside world, but during the current COVID-19 crisis this is drastically more so. Mrs. Lee's age plus her compromised immune system place her among those most at risk from COVID-19. The coronavirus is particularly dangerous for the elderly. *See* Centers for Disease Control and Prevention (CDC), *Coronavirus Disease 2019; Older Adults*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fspecific-groups%2Fhigh-risk-complications%2Folder-adults.html (last visited July 3, 2020). Fully 8 out of 10 deaths reported in the United States have been in adults 65 years old and older. *Id*. And, according to the CDC, "People with weakened immune systems are at higher risk of getting severely sick from SARS-CoV-2, the virus that causes COVID-19." CDC, *Coronavirus Disease 2019; If You Are Immunocompromised, Protect Yourself From COVID-19*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/immunocompromised.html (last visited July 9, 2020). Thus, due to her illness and the added danger from COVID-19, Mrs. Lee needs her son's assistance in caring for both H.T.L. and herself.

It is important that Mr. Lee be there to care for H.T.L. during this difficult time. The Supreme Court has repeatedly recognized how vital an interest a parent has in the care, custody, and raising of his children:

> The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child

6

> to the State. Even when blood relationships are strained, parents retain a
> vital interest in preventing the irretrievable destruction of their family life.

*Santosky v. Kramer*, 455 U.S. 745, 753 (1982); *see also id.* at 758-59 ("*Lassiter* [*v. Dep't of Soc. Servs. of Durham Cnty., N. C.*, 452 U.S. 18, 27 (1981)] declared it 'plain beyond the need for multiple citation' that a natural parent's 'desire for and right to "the companionship, care, custody, and management of his or her children"' is an interest far more precious than any property right."). The Tenth Circuit has also recognized that, "[a]s a general matter, a father has a fundamental liberty interest in maintaining his familial relationship with his son." *United States v. Edgin*, 92 F.3d 1044, 1049 (10th Cir. 1996).

Mr. Lee's interest in caring for his son would be a compelling circumstance in normal times. But the changed circumstance occasioned by his mother's deteriorating health and the danger to her from COVID-19 make the need for Mr. Lee's assistance in caring for H.T.L. an extraordinary and compelling reason for granting Mr. Lee compassionate release under 18 U.S.C. § 3582(c).

### B. The dangers presented by the COVID-19 pandemic present extraordinary and compelling reasons to reduce Mr. Lee's sentence.

In addition to the threat posed by COVID-19 to Mr. Lee's mother and the impact from that threat on her need for Mr. Lee to care for H.T.L., the COVID-19 threat to Mr. Lee himself presents an additional reason for the Court to grant compassionate release to Mr. Lee.

On March 11, 2020, the World Health Organization declared a world pandemic due to the spread of the novel coronavirus, COVID-19. *See* WHO Director-General's

Opening Remarks at the Media Briefing on COVID-19, March 11, 2020, https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.  At that time, there were more than 118,000 cases in 114 countries, and 4,291 people had lost their lives.  *Id.*  Today, there are 12,750,275 confirmed cases worldwide, and 566,355 people have died.  World Health Organization, *WHO Coronavirus Disease (COVID-19) Dashboard*, https://covid19.who.int (last visited July 13, 2020).

The situation in the United States is dire and becoming more so by the day.  As of July 10, 2020, the United States has at least 3,047,671 people known to have been infected with the coronavirus—far more than any other nation—and our country has suffered at least 132,056 deaths.  Centers for Disease Control and Prevention, Coronavirus Disease 2019 (COVID-19): Cases in U.S., https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (updated July 10, 2020).  From July 9 to July 10, the United States reported 64,771 new cases, part of an alarming uptick in the spread of the illness.



*Id.*

Prisons are especially dangerous places to be during a pandemic. Public health experts have loudly articulated the dangers faced by prisoners in particular during this crisis. Even if the flow of staff, new inmates, attorneys, and visitors "is limited to the extent possible, correctional facilities remain densely populated and poorly designed to prevent the inevitable rapid and widespread dissemination of this virus." Josiah Rich, Scott Allen, Mavis Nimoh, *We must release prisoners to lessen the spread of coronavirus*, The Washington Post (March 17, 2020). According to Dr. Brie Williams:

> Because inmates live in close quarters, there is an extraordinarily high risk of accelerated transmission of COVID-19 within jails and prisons. Inmates share small cells, eat together and use the same bathrooms and sinks. They eat together at small tables that are cleaned only irregularly. Some are not given tissues or sufficient hygiene supplies. Effective social distancing in most facilities is virtually impossible, and crowding problems are often compounded by inadequate sanitation, such as a lack of hand sanitizer or sufficient opportunities to wash hands.

(Affidavit of Brie Wiliams, M.D., at 3, attached as Exhibit 4 hereto (footnotes omitted).)

According to the BOP, there are currently 2,938 inmates and 242 BOP staff who have confirmed positive test results for COVID-19 nationwide. https://www.bop.gov/coronavirus/index.jsp (last visited July 13, 2020) [hereinafter "*BOP Coronavirus*"]. This is an almost fifty percent increase in the number of positive inmates from a week before. These are the figures for those in the BOP *who have been tested*. While the BOP "has 129,929 federal inmates in BOP-managed institutions and 13,714 in community-based facilities," only 27,954 tests have been completed, and 4,326 are pending. *Id.*; *see also* P. Eisler, L. So, N. Parker, B. Heath, *Special Report: 'Death Sentence' - the hidden coronavirus toll in U.S. jails and prisons*, Reuters, May 18, 2020 (discussing that because of the lack of widespread testing in the BOP, "figures compiled

9

by the U.S. government appear to undercount the number of infections dramatically in correctional settings, Reuters found)." Presumably, many of those with a positive test result have been released, because BOP reports that there have been 8,075 positive tests. *BOP Coronavirus*.

Mr. Lee is incarcerated at FCI Safford in Safford, Arizona. The BOP is not currently reporting any cases at FCI Safford, but Safford is a mere 130 miles from Tucson and 165 miles from Phoenix. Arizona has recently seen one of the worst surges in COVID-19 cases in the country with more than one in four tests coming back positive. *See* Howard Fischer, *Az. Gov. Ducey: Stay-at-home order not needed, even as COVID-19 cases rise*, Tucson.com, July 10, 2020. As of July 10, 2020, the state was reporting a total 116,892 cases and 2,082 deaths. *See* Arizona Department of Health Services, Data Dashboard, https://www.azdhs.gov/preparedness/epidemiology-disease-control/infectious-disease-epidemiology/covid-19/dashboards/index.php (last visited July 10, 2020). In fact, the number of confirmed cases in Arizona has been growing more rapidly than any other state in the country and faster than any country in the world. Jen Fifield, *Is COVID-19 spreading more rapidly in Arizona than anywhere else in the world? Here's what data shows*, azcentral.com, July 10, 2020. The tables below demonstrate the frightening rate of increase in Arizona cases and deaths.





*Arizona Coronavirus Map and Case Count*, The New York Times, July 10, 2020. The Arizona outbreak is so severe that the Harvard Global Health Institute has called for a mandatory shutdown in the state. *See* Antonia Noori Farzan, et al., *Experts call for shutdowns as coronavirus infections and hospitalizations spike in some states*, The Washington Post, July 10, 2020.

      Under 18 U.S.C. § 3582(c)(1)(A) and U.S.S.G. § 1B1.13, Application Note 1(D), the extreme risk posed by the COVID-19 crisis is an extraordinary and compelling reason to release Mr. Lee. *See United States v. Jenkins*, No. 99-CR-00439-JLK-1, 2020 WL 2466911, at *5 (D. Colo. May 8, 2020) (determining that court had authority to

grant compassionate release under the catchall "other" category, which "seems a better fit for a devastating pandemic that subjects particular individuals to grave outcomes"). *But see Edington*, 2020 WL 2744140, at *3 (finding that COVID-19 crisis was extraordinary but not compelling under the circumstances presented there). Mr. Lee is himself almost 54 years old, placing him at elevated risk from COVID-19. *See* CDC, *Older Adults*, *supra*. He is incarcerated in a state with what appears to be a runaway outbreak of the illness. He is a nonviolent offender who has served the mandatory minimum for his offenses. He has been punished for what he did. Continuing to incarcerate him during this pandemic will not further his rehabilitation nor reduce the risk of recidivism. The possibility of death was certainly not part of the sentence either Congress or this Court envisioned in a case such as Mr. Lee's. The Court should thus grant Mr. Lee compassionate release to avoid that possibility.

### C.  The § 3553(a) factors support compassionate release.

When extraordinary and compelling reasons are established, the Court must consider the relevant sentencing factors in § 3553(a) to determine whether a sentence reduction is warranted. 18 U.S.C. § 3582(c)(1)(A)(i). Here, the § 3553(a) factors favor reduction.

Prior to these cases, Mr. Lee had never served a period of imprisonment. He has now been incarcerated for nine years. During that time, Mr. Lee has incurred only two, nonviolent disciplinary infractions—one for gambling/phone abuse in 2016 and one for refusing to obey an order in 2017. (*See* Inmate Discipline Data (June 9, 2020), attached Exhibit 5.)

Mr. Lee will turn 54 years old in just over two months. This puts him at an age where data demonstrate that his risk of reoffending has dropped dramatically but the cost of incarcerating him will soon increase dramatically. "Rates of crime decline dramatically after age 55 while the costs of care for older adults greatly exceed costs of care for younger adults." S. Rakes, et al., *Recidivism among Older Adults: Correlates of Prison Re-entry*, at 2, Justice Policy Journal (Spring 2018) (citations omitted); *see also id.* at 9 ("Upon examining correlates of prison readmission in older adults, age accounted for more variation in recidivism than any other demographic or criminogenic variable included in the model."). The U.S. Sentencing Commission recently undertook a comprehensive study and concluded that "numerous recidivism studies document well that older offenders are at a lower risk for reoffending." United States Sentencing Commission, *The Effects of Aging on Recidivism Among Federal Offenders*, at 10 (Dec. 2017). The Sentencing Commission relied on the work of David P. Farrington, who documented the continuing decline in recidivism with age:

13



FIG. 2.—*a*, The relation between age and crime for American males. *b*, The relation between age and crime for American females. The graphs in both *a* and *b* show the rate of arrests per 100 population for Index offenses in the year 1982. Source: Federal Bureau of Investigation (1983).

David P. Farrington, *Age and Crime*, 7 Crime and Justice: An Annual Review of Research, at 193 (1986), *cited in The Effects of Aging*, *supra*, at 10 n.15. The Sentencing Commission itself looked at FBI data on overall recidivism rates nationally in 2016 as well as federal offenders specifically, and documented the dramatic decline among both groups:

14



*The Effects of Aging*, *supra*, at 11.  Importantly, recidivism rates for violent crime in particular are dramatically lower for older offenders.  Research has determined that "desistance from crime—most notably violent crime—increases with age."  Rakes, *supra*, at 10.  Thus, due to age alone, Mr. Lee presents an extremely low risk of committing another offense.

Furthermore, according to "the best available evidence, . . . prisons do not reduce recidivism more than noncustodial sanctions."  Francis T. Cullen et al., *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011).  Also, the Sentencing Commission has found that "[t]here is no correlation between recidivism and guidelines' offense level. . . .  While surprising at first glance, this finding should be expected.  The guidelines' offense level is not intended or designed to predict recidivism."  U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 15 (2004).

15

Mr. Lee has also pursued opportunities while incarcerated to ensure that he will not return to the criminal justice system when released. Most notably, he recently completed the Bureau of Prisons Residential Drug Abuse Program (RDAP). RDAP is the BOP's most intensive treatment program where individuals in the program live in a modified therapeutic community model inside of the prisons, affording them a pro-social community. *See* Federal Bureau of Prisons, *Substance Abuse Treatment*, https://www.bop.gov/inmates/custody_and_care/substance_abuse_treatment.jsp (last visited July 10, 2020). The therapeutic services provided are based on cognitive behavioral therapy; an extensively studied and effective modality for treating addiction. *Id.* The BOP and the National Institute on Drug Abuse conducted a rigorous analysis of the RDAP program. *Id.* The research findings demonstrate that RDAP participants are significantly less likely to recidivate and less likely to relapse than non-participants. *Id.* The study also found RDAP participation makes a significant difference in the lives of offenders following their release from custody as they return to the community. *Id.* Notably, Mr. Lee chose to pursue the RDAP program despite the fact that he is ineligible for the one-year reduction in sentence that normally accompanies completion.

In a letter to the Court, Mr. Lee's lifelong friend Reverend Tommie L. Williams explains that he has continued to have "brotherhood conversations" with Mr. Lee during his incarceration. [Ex. 3 at 2.] Mr. Lee has demonstrated an understanding of the wrongs he has done and seeks to make amends for those wrongs. [*Id.*]

Reverend Williams also discusses a release plan for Mr. Lee. Reverend Williams is an architect and contractor and has already arranged employment for Mr. Lee: "I have

16

arranged with my Sub Contractors to provide a paid internship. I will also assist in helping Mr. Lee to obtain specialized training in the Construction/Project management field." [*Id.* at 1.]

On release, Mr. Lee will live with his mother and his son. He will assist in the care for both. It is well-established that family members are crucial to rehabilitative efforts as they provide both social control and social support. *See* L. Charkoudian, et al., *The Role of Family and Pro-Social Relationships in Reducing Recidivism*, 74 Corrections Today 94 (August 2012). Thus, in addition, to the release of Mr. Lee to care for his minor son being an extraordinary and compelling circumstance under U.S.S.G. § 1B1.13, Application Note 1(C), Mr. Lee's caring for his son will also be a positive factor in ensuring that he does not recidivate.

### IV.     Conclusion

Congress established a ten-year mandatory minimum for the offense of which Mr. Lee has been convicted to reflect the seriousness of the offense, and Mr. Lee has served that period of incarceration. Release of Mr. Lee under the compassionate release statute would not diminish the seriousness of the offense of conviction, but rather would fulfill Congress's intent in offering courts greater flexibility to reduce sentences when changed circumstances justify a second look. Here, the change in Mr. Lee's family circumstances warrant a reduced sentence. Mr. Lee's mother is ill and unable to care properly for herself much less for herself and Mr. Lee's minor son. Additionally, Mr. Lee is stuck in a place of great risk to his health during an outbreak of COVID-19 that is worse in the state where he is confined than anywhere in the world.

These circumstances, either alone or combined, justify the Court reducing Mr. Lee's sentence under the compassionate release statute.  If the Court wishes to impose additional conditions of supervised release—such as a period of home confinement (with appropriate exceptions for work and to care for his mother and son) commensurate with the remaining term of incarceration—Mr. Lee would have no objection.

WHEREFORE, for the aforementioned reasons, Mr. Lee respectfully asks that the Court grant this Motion and reduce Mr. Lee's sentence to time served.

DATED this 13th day of July 2020.

Respectfully submitted,

JOHNSON & KLEIN, PLLC

s/ Eric K. Klein
**Eric K. Klein**, #42185
1470 Walnut Street, Suite 101
Boulder, CO  80302
Telephone: (303) 444-1885
Fax: (866) 340-8286
eklein@johnsonklein.com
ATTORNEY FOR TIMOTHY LEE

## CERTIFICATE OF SERVICE

  I hereby certify that a true and correct copy of the foregoing MOTION FOR COMPASSIONATE RELEASE was served electronically through the CM/ECF system, this 13th day of July 2020 to the following:

  All counsel of record

           *s/ Holly Koehler*
           Holly Koehler
           Paralegal